# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 27, 2011 Session

## STATE OF TENNESSEE v. HANES COOPER

**Appeal from the Criminal Court for Hawkins County**
**No. 08CR0402     John F. Dugger, Jr., Judge**

---

**No. E2011-00046-CCA-R3-CD - Filed February 9, 2012**

---

The Defendant, Hanes Cooper, appeals as of right from the trial court's denial of judicial diversion.  The Defendant pled guilty to attempted theft of $10,000 or more but less than $60,000, official misconduct, and conspiracy to commit forgery of $10,000 or more but less than $60,000.  After the plea agreement was entered, the Defendant filed an application for judicial diversion which the trial court denied.  Following the denial of his application for judicial diversion, the Defendant was sentenced, pursuant to the plea agreement, to a six-year term of probation.  The Defendant contends that the trial court abused its discretion in denying his application for judicial diversion.  Discerning no error, we affirm the trial court, but we remand the case for correction of the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Phillip L. Boyd, Rogersville, Tennessee, for the appellant, Hanes Cooper.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; C. Berkeley Bell, Jr., District Attorney General; and Chadwick W. Jackson, District Attorney General, pro tem, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

This case arose from a complaint made to the Office of the Comptroller of the Treasury that the Defendant's daughter, Robin Hoffman, was being paid for work actually

performed by the Defendant. The comptroller's office conducted an investigatory audit and verified that the allegations were true. As a result of the investigation conducted by the comptroller's office, both the Defendant and Ms. Hoffman were charged with money laundering, conspiracy to commit theft of $10,000 or more but less than $60,000, theft of $10,000 or more but less than $60,000, official misconduct, conspiracy to commit forgery of $10,000 or more but less than $60,000, and forgery of $10,000 or more but less than $60,000. The Defendant was also indicted on an additional charge of official misconduct. Pursuant to a plea agreement, the charges of conspiracy to commit theft of $10,000 or more but less than $60,000 and forgery of $10,000 or more but less than $60,000 were amended to attempted theft of $10,000 or more but less than $60,000 and conspiracy to commit forgery of $10,000 or more but less than $60,000. On June 11, 2010, the Defendant pled guilty to the amended charges along with one count of official misconduct. Ms. Hoffman pled guilty to facilitation of official misconduct and conspiracy to pass altered or forged instruments, and was subsequently granted judicial diversion by the trial court.

After entering his guilty plea, the Defendant filed an application for judicial diversion with the trial court. The trial court held a hearing on this matter on December 10, 2010. At the hearing, Rita Dykes testified that she was the general manager of the Surgoinsville Utility District and that from 1990 to 2008 she had worked as the office manager for the utility district. Ms. Dykes explained that the utility district was governed by a three-member commission, but that she had always viewed the Defendant "as being [her] direct boss." According to Ms. Dykes, when she was hired in 1990, the Defendant "was [her] boss then" and she had always believed the Defendant to be her boss because "he always did the pretty much day-to-day runnings [sic] of the utility." The Defendant would give Ms. Dykes instructions as to what to do at the utility district and the Defendant would also decide when to send other employees "home from work."

Sometime in 2000, the Defendant was appointed to the utility district's commission. The Defendant received payment from the utility district for serving on the commission. However, the Defendant also received payment from the utility district for his work as an employee, continuing to do office work and working on the water lines after his appointment. Ms. Dykes testified that this continued until the fall of 2003 when a customer asked to see the Defendant's timesheets. Ms. Dykes testified that she told the Defendant about the request and the Defendant instructed her not to show the timesheets to the customer. For a period of time after the request the Defendant stopped turning in his timesheets and did not receive anymore checks for his work as an employee. Then in March 2004, the Defendant told Ms. Dykes that he "was going to submit his time with [Ms. Hoffman's] time on [her] timesheets." From that point on, Ms. Hoffman received a check in her name for the time worked both by her and the Defendant.

Ms. Dykes testified that between 2004 and 2008 she frequently worked with the Defendant in the utility district office, but that Ms. Hoffman worked infrequently. Ms. Hoffman had a second job working at the local post office. Ms. Dykes further testified that one of her duties as office manager was to post customer payments into the utility district's computer system. Ms. Dykes testified that Ms. Hoffman "knew how to do that some" and "posted some payments." However, Ms. Dykes was positive that she posted almost all of the payments between 2004 and 2008. In fact when Ms. Dykes would go on vacation, the other employees would leave the postings for her to do when she returned. While Ms. Dykes was on vacation, Ms. Hoffman would take deposits to the bank, but would leaving the postings for Ms. Dykes to do when she returned. Ms. Dykes denied that Ms. Hoffman would come to the utility district office after hours to post payments into the computer system.

Ms. Dykes admitted that she signed all of Ms. Hoffman's timesheets even though she knew Ms. Hoffman had not worked all of the hours reported on the timesheets. Ms. Dykes also admitted that she signed all of the checks made to the Defendant and Ms. Hoffman. However, Ms. Dykes explained that she did so despite knowing Ms. Hoffman had not worked all of the reported hours because the Defendant "didn't want to sign off on" the timesheets and she was told to do so "by [her] boss," the Defendant. Ms. Dykes testified that she thought what the Defendant and Ms. Hoffman were doing was "deceitful," but admitted that she never complained about the arrangement to the other members of the commission or outside authorities. Ms. Dykes testified that she was afraid to report the Defendant's actions. Ms. Dykes also testified that she did not complain to the other members of the commission because the Defendant was the secretary and treasurer of the comission and "he had the ultimate say" in financial matters.

Robert Allen, an investigator auditor with the Tennessee Comptroller of the Treasury's office, testified that he personally conducted the investigatory audit of the utility district. Mr. Allen compared Ms. Hoffman's timesheets from the utility district with her timesheets from the post office. From 2004 to 2007, Ms. Hoffman reported working 3,221.25 hours at the utility district. Mr. Allen found that there were 223 hours where Ms. Hoffman had reported working at the utility district and the post office at the same time. Mr. Allen also compared the hand written receipts that were given to customers to help determine who had worked on various days. For the days Ms. Hoffman had reported working on her timesheets, there were 1,215 hand written receipts. Ms. Hoffman prepared only six of those receipts. For the days on which Ms. Hoffman should have been alone in the office, there were 361 hand written receipts. The Defendant had prepared 275 of those receipts while Ms. Hoffman had prepared only three. However, once the audit began, "suddenly Ms. Hoffman began preparing hand prepared receipts."

Mr. Allen testified that he could not say for certain if "any money was stolen or a theft" occurred in this case. Mr. Allen explained that this was because the Defendant had reported his hours on Ms. Hoffman's timesheets. According to Mr. Allen, this made it impossible to determine who had performed what work, or if any work had been performed at all. As Mr. Allen explained, because the timesheets "reflect hours that don't appear to actually have been worked[,] [t]here's no way to know whether the total hours were actually worked."

At the hearing, the Defendant testified that he was 78 years old, that he was blind in one eye due to a recent stroke, and that he had only one lung. The Defendant testified that he was retired from Tennessee Eastman Corporation, where he had worked 24 years as a baker. The Defendant had served 40 years in the Surgoinsville city government, including 24 years as mayor. The Defendant had also served as a Hawkins County Commissioner for 34 years. The Defendant had served in the volunteer fire department and various other civic organizations as well. The Defendant testified that he was a widower and that he lived with his daughter, Ms. Hoffman, and his granddaughter.

The Defendant testified that he had worked for the utility district as a line repairman since the utility district was formed, approximately 52 years ago. When asked to describe his job duties, the Defendant responded that he did "anything that there was to do at the [utility district]." The Defendant also worked in the utility district's office and took customer payments. At the time in question, the utility district had no actual manager, but the Defendant conceded that he "probably" ran the day-to-day operations of the utility district. The Defendant admitted that he would send employees home when there was not enough work to do and that he hired temporary employees when necessary to assist in meter reading. In 2000, the Defendant was appointed by the county mayor to the utility district's commission. While on the commission, the Defendant served as the secretary and treasurer and was responsible for the utility district's finances. The Defendant admitted that he continued to work for the utility district as an employee after he was appointed to its commission.

The Defendant denied knowing that it was a conflict of interest for him to continue as an employee of the utility district after his appointment to the commission. The Defendant also denied that he had ever received any training that would have taught him about such conflicts of interest. The Defendant testified that no one ever complained about his dual positions with the utility district. The Defendant denied that he ever directed Ms. Dykes to write checks to Ms. Hoffman instead of to the Defendant. The Defendant also denied telling Ms. Dykes that he was "going to get paid one way or another" after turning in one of Ms. Hoffman's timesheets.

The Defendant claimed that he had his payroll checks from the utility district stopped and put with Ms. Hoffman's checks because "she worked there most of the time . . . and so we just thought it was in the best interest to put it in her name and then she filed it on her income tax." The Defendant admitted that his daughter paid the income tax on his earnings, but said he did it because he was "just trying to help [his] daughter out." When asked if this practice was dishonest, the Defendant responded that he did not think so because he was just "following the same procedure that had been going on for [52] years." However, the Defendant later admitted during questioning by the trial court that he had his checks made out to Ms. Hoffman so "she could pay income tax on it and everything instead of [him]." The Defendant further admitted he did this because Ms. Hoffman would pay less income tax on the money than he would have.

The Defendant also explained that he did not think that his working in Ms. Hoffman's place while she was working at the post office was dishonest. According to the Defendant, Ms. Hoffman attempted to quit the utility district for her job at the post office, but people associated with the utility district essentially begged her to stay and told her that the Defendant could work for her. The Defendant had no explanation for why Ms. Hoffman had only prepared six hand written receipts during the four years she was supposedly working at the utility district. The Defendant denied that he or Ms. Hoffman ever stole money from the utility district or that they were ever paid for hours they did not work. However, when asked how to describe what he did, the Defendant stated that it was a mistake and that he was sorry for it because it had "cost [him] around three times as much as [he] got out of it or [Ms. Hoffman] got [out] of it."

James B. Ford, a retired accountant and defense counsel's first cousin, testified that he reviewed the utility district's yearly financial audit reports. Mr. Ford concluded that it was unlikely that the Defendant and Ms. Hoffman were paid for work that was not done because what the utility district spent on employee wages was "within five or six percent" of what the utility district had budgeted for wages. Mr. Ford opined that had there been any fraud or theft, it would have been flagged in the yearly audits as a material transaction. Mr. Ford explained that if "a material transaction was to have occurred, it would automatically jump out against your budget that, say, the operating wages were higher than the budget that had been prepared the year before, that type of thing." Mr. Ford testified that none of the yearly audits he reviewed had any such material transaction or showed any extraordinary expenditures.

However, Mr. Allen testified that an investigative audit was markedly different from a typical yearly financial audit. Mr. Allen explained that a financial audit "is not geared towards finding or locating fraud." Instead, financial audits are conducted to ensure that the company's financial statements are in compliance with generally accepted accounting

principles. Mr. Allen further explained that fraud can occur and still not be a material transaction. For example, if the materiality threshold for an audit is $10,000 then any transaction under $10,000 would not be flagged as material. Mr. Allen further testified that the mere fact there were no extraordinary expenditures did not mean a theft had not taken place because "expenditures don't have to be extraordinary to be theft."

Douglas Price testified on the Defendant's behalf. Mr. Price testified that he was the former Hawkins County Executive and was familiar with the Defendant from his time on the Hawkins County Commission. Mr. Price testified that he and the Defendant often traveled together on county business and that he had no reason to believe that the Defendant had ever abused his reimbursement privileges. Mr. Price also testified that he believed the Defendant was a truthful individual. William Price testified that he had known the Defendant his whole life and had been active with the Defendant in the local Ruritan Club. Mr. Price testified that the Defendant often served as a cashier at Ruritan Club fundraisers and that "there was never any question about a dime being missing." Mr. Price also testified that he would "trust [the Defendant] with [his] bank account."

At the conclusion of the hearing, the trial court denied the Defendant's application for judicial diversion. The trial court concluded that the Defendant was amenable to correction. The trial court stated that it did not believe that the Defendant would "be out doing any other crimes" or that he would be placed back into a position of public trust. The trial court also noted that the Defendant had no criminal record. The trial court concluded that these factors as well as the Defendant's social history, his physical and mental health, and the deterrence value to the Defendant all weighed in favor of granting judicial diversion. The trial court also concluded that granting judicial diversion would serve the Defendant's interest. However, the trial court ultimately concluded that the circumstances of the offense and the deterrence value to others outweighed the positive factors. The trial court also concluded that granting judicial diversion would not serve the interests of the public.

The trial court gave great weight to the circumstances of the offense and the deterrence value to others. With respect to the circumstances of the offense, the trial court stated that it believed the Defendant did not want to give up his power as a member of the utility district's commission or the extra income he derived from his work for the utility district despite the conflict of interest. The trial court stated that the Defendant appeared "to be the alter ego of the [utility district]" and that he "start[ed] thinking it's kind of [his] business even though it's a public entity." The trial court also placed great emphasis on the fact that the Defendant began submitting his time and received payments under Ms. Hoffman's name after a customer inquired about the Defendant's timesheets. The trial court concluded that this action belied the Defendant's claim that he did not know his being on the commission and working as an employee was a conflict of interest. The trial court also

-6-

concluded that not granting judicial diversion would serve as deterrent to other public employees and public decision makers, especially now when "[m]oney is tight in all the counties." The trial court expounded that "everyone knows that if they're in a position of trust, handling public funds, public records, documents, decision making, everything, you've got to do it right."

The trial court determined that the circumstances of the offense and the deterrence value to others outweighed the other factors favoring judicial diversion. The trial court then determined denial of judicial diversion would serve the interests of the public, and concluded as follows:

> [T]he public has to have the utmost confidence in the system [of] government because money is tight. People are scrounging to pay their taxes and everything; and this little utility district, it was almost like [the Defendant's] business after all these years. The two commissioners were around once in a while but he hired them, he did the work, he was there, he supervised, he did everything. And it worked for years, but what he did wasn't on the up and up. It wasn't on the up and up, and all the public and people of Surgoinsville need to know the truth that he didn't steal a bunch of money from them as far as [] the [S]tate can prove but what he did was wrong, falsified records, instructed [an] employee to falsify records, funneled money to his daughter [to] lower her taxes [and] for him to save money on income tax. All of that is bad. And he's held [to a] high[er] standard as a commissioner.

> So for all those reasons, the [c]ourt cannot grant the judicial diversion.

## ANALYSIS

The Defendant contends that the trial court abused its discretion in denying his application for judicial diversion. The Defendant argues that judicial diversion should have been granted because the State did not prove the Defendant stole any money from the utility district. The Defendant essentially argues that judicial diversion is warranted because the State failed to prove a crime took place. The Defendant also contends that judicial diversion should have been granted because Ms. Hoffman received judicial diversion for her crimes. The State responds that the trial court considered all of the required factors and did not abuse its discretion in deciding to reject the Defendant's request for judicial diversion.

There is no dispute that the Defendant is eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial

-7-

court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id. When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997).

The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. Lewis, 978 S.W.2d at 566. The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Additionally, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). However, "[t]he denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this factor outweighs all others that might favorably reflect on the [d]efendant's eligibility." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. Nov. 13, 2002) (citing State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999)).

The record reflects that the trial court considered and weighed all of the required factors in arriving at its decision. The trial court explained on the record why it denied the Defendant's application for judicial diversion and explained why the circumstances of the offense and the deterrence value to others outweighed the other factors. The trial court relied heavily upon the fact that the Defendant abused a position of public trust. This court has previously held that "public officials are called upon to act in accordance with a higher standard than that applied to an average citizen." State v. Rufus Steven Johns, No. M2002-00599-CCA-R3-CD, 2002 WL 31894619, at *3 (Tenn. Crim. App. Dec. 31, 2002), perm. appeal denied, (Tenn. June 2, 2003). There is no evidence in the record to suggest that the trial court abused its discretion in denying the Defendant's application for judicial diversion.

The Defendant contends that judicial diversion should have been granted because the State did not prove he stole anything from the utility district. However, the Defendant pled guilty to attempted theft along with two other offenses. Attempted theft is an inchoate offense which by its very nature does not require proof that the underlying offense was completed. See § 39-12-101, Sentencing Comm'n Cmt. ("Criminal attempt is an offense directed at the individual whose intent is to commit an offense, but whose actions, while

strongly corroborative of criminal intent, fail to achieve the criminal objective intended"). The fact that the Defendant may not have successfully completed a "theft" from the utility district in no way requires the granting of diversion in this case. With respect to the Defendant's argument that he should receive judicial diversion because Ms. Hoffman received judicial diversion, we note that this argument is without merit. The Defendant was a member of the utility district's commission and held a position of public trust that Ms. Hoffman did not. Because of this the trial court viewed the Defendant's actions as more egregious than Ms. Hoffman's actions. Because there is no evidence that the trial court abused its discretion, we affirm the trial court's denial of judicial diversion.

However, following our review of the record, we note that the judgments incorrectly reflect that the Defendant was sentenced to six years incarceration in the Tennessee Department of Correction with no alternative sentence having been marked on the judgment forms. The record clearly reflects that the Defendant was sentenced to a six-year term of probation. Accordingly, we remand the case to the trial court for entry of corrected judgments reflecting the proper sentence as imposed by the trial court at the judicial diversion hearing.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. The case is remanded to the trial court for the purpose of entering corrected judgments, as provided for in this opinion.

_____
D. KELLY THOMAS, JR., JUDGE